UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

ROYDEL NICHOLSON,

                  Defendants.

_____

        <u>REPORT & RECOMMENDATION</u>

        15-CR-6143L

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. David G. Larimer, United States District Judge, dated October 21, 2015, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 17).

On October 20, 2015, the grand jury returned a seven-count indictment against defendant Roydel Nicholson.  (Docket # 16).  The first six counts charge Nicholson with mail fraud, in violation of 18 U.S.C. §§ 1341 and 2.  (*Id.*).  The seventh count charges him with international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).  (*Id.*).

Currently pending before the Court is a motion by Nicholson seeking to suppress statements that he made at the time of his arrest and tangible evidence seized from 150 Van Auker Street, Rochester, New York.[1]  (Docket ## 26, 44).  For the reasons discussed below, I recommend that the district court deny Nicholson's suppression motion.

---

[1]  Nicholson filed omnibus motions seeking other forms of relief.  Specifically, Nicholson sought Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 26).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on December 1, 2015.  (Docket ## 33, 34).

## FACTUAL BACKGROUND

I.      **April 24, 2015 Arrest of Nicholson**

This Court conducted an evidentiary hearing on January 5, 2016 concerning the circumstances surrounding Nicholson's arrest and statements he made following that arrest. (Docket # 35).[2]  During the hearing, the government offered testimony from Special Agent Jerrod Kremblas ("Kremblas").  (Tr. 4).  Kremblas testified that he has been employed as a special agent with the Department of Homeland Security ("DHS") for approximately eight years and is currently assigned to the Buffalo, New York office.  (*Id.*).

Kremblas testified that he was involved in an investigation relating to Nicholson and participated in his arrest on April 24, 2015.  (Tr. 4-5).  On that date, at approximately 8:00 a.m., Kremblas and eight other law enforcement officers, including a United States postal inspector and members of DHS and the Rochester Police Department ("RPD"), arrived at Nicholson's apartment building, located at 150 Van Auker Street, Rochester, New York, to execute an arrest warrant for Nicholson.  (Tr. 4-5, 22).  Kremblas testified that all of the officers were wearing police or law enforcement uniforms, and none of them drew their guns during the arrest.  (Tr. 23, 52-53).

According to Kremblas, he and six other officers approached Nicholson's apartment door, and he knocked on it and announced, "Police."  (Tr. 5, 22-24).  Nicholson, who was fully dressed, answered the door, which opened inward, and Kremblas asked him if he was Roydel Nicholson, to which Nicholson responded, "Yes."  (Tr. 6, 23-25, 51-52).  Kremblas testified that Nicholson took a step "back into the doorway" into his apartment.  (Tr. 25-26). Kremblas stepped forward and guided Nicholson farther into the sitting area of the apartment to restrain him and conduct a pat frisk.  (Tr. 27-29).  Kremblas explained that the hallway

---

[2]  The transcript of the January 5, 2016 hearing shall be referred to as "Tr. __."  (Docket # 37).

immediately inside the doorway was too small to conduct a proper pat down of Nicholson. (Tr. 28-30). Kremblas also testified that he believed that it was important to handcuff Nicholson immediately because he did not know whether other individuals were inside the apartment. (Tr. 25). With respect to his decision to arrest Nicholson inside his apartment, Kremblas testified that the decision was a "spur-of-the-moment" decision prompted by Nicholson's movement to step backwards into the apartment and the presence of the other officers in the hall behind Kremblas, which made it difficult "to reverse direction safely." (Tr. 56).

Kremblas informed Nicholson that he was under arrest and that the officers had a federal warrant for his arrest. (Tr. 31). Kremblas handcuffed Nicholson and performed a pat down. (Tr. 6, 24, 30-31). Kremblas testified that he explained "why [they] were there, what the arrest warrant was for and what was going to happen" and asked Nicholson whether he would like to speak to them. (Tr. 6-7). Nicholson responded, "Yes." (Tr. 7).

As Kremblas was speaking to Nicholson, other officers conducted a security sweep of the apartment to ensure that there were no weapons or other individuals who might pose a threat to the officers. (Tr. 7, 41). When they were done, the officers returned to the sitting area where Kremblas and Nicholson were located, informed Kremblas that the apartment was "clear," and awaited further instructions from Kremblas. (Tr. 41-42).

Kremblas testified that he and Postal Inspector Mann ("Mann") seated Nicholson at a table with them in the sitting area. (Tr. 7, 10, 13, 40-41). Kremblas removed Nicholson's handcuffs and took out a blank Statement of Rights form. (Tr. 7, 33; Government's Exhibit ("G. Ex.") 1). Kremblas again asked Nicholson whether Nicholson wanted to speak to him, and Nicholson responded affirmatively. (Tr. 7-8). Kremblas explained the purpose of the form, read

the rights listed aloud to Nicholson, and showed the form to him.[3]  (*Id.*).  After reading each

right, Kremblas asked Nicholson whether he understood and whether he had any questions.

(Tr. 8-9).  After finishing that colloquy for each right, Kremblas instructed Nicholson to place his

initials on the form next to each right.  (Tr. 8-9; G. Ex. 1).  Kremblas read aloud the waiver

provision of the form.[4]  (Tr. 9; G. Ex. 1).  Nicholson signed the form at approximately 8:15 a.m.

(Tr. 9, 32; G. Ex. 1).

       After discussing the Statement of Rights form, Kremblas asked Nicholson if they

could search his apartment, and Nicholson agreed.  (Tr. 36-38).  Kremblas testified that he was

interested in searching Nicholson's apartment, but did not have a search warrant.  (Tr. 54-55).

---

[3]  The form provides:

> Before we ask you any questions, it is my duty to advise you of your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court, or other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.
>
> If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

(G. Ex. 1).

[4]  The waiver provision stated:

> I have had the above statement of my rights read and explained to me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity.  I was taken into custody at 0800 (time), on 4-24-15 (date), and have signed this document at 0815 (time), on 4-25-15 (date).

(G. Ex. 1).

Kremblas produced a Consent to Search form, filled it in, and then read it aloud to Nicholson.[5]

(Tr. 10-12, 36-39; G. Ex. 2).  After he was done, Kremblas asked him whether he would agree to

allow the officers to search his apartment, and Nicholson responded, "Yes."  (Tr. 39).  At that

point, Kremblas told Nicholson, "If you understand [the form], please sign it."  (*Id.*).  Kremblas

testified that Nicholson signed the Consent to Search form.  (Tr. 12).  Kremblas affirmed that he

did not make any promises or threats to Nicholson to induce him to sign it.  (*Id.*).

   Following the execution of the Consent to Search form, Kremblas and Mann

interviewed Nicholson, while the other officers searched of the apartment.  (Tr. 13, 40, 42).

Some of the searching officers occasionally interrupted the interview to ask Kremblas and Mann

whether certain items were relevant to the investigation.  (Tr. 14, 43).  Kremblas testified that

Nicholson sometimes directed the officers to places in the apartment where particular evidence

could be found.  (Tr. 14).  According to Kremblas, Nicholson appeared coherent and unimpaired

by alcohol or drugs.  (Tr. 9).  Kremblas testified that Nicholson, who spoke with a Jamaican

---

[5]  The form provides:

> I, *Roydel Nicholson*, have been informed by U.S. Immigration and Customs Enforcement (ICE) Special Agent *Jerrod Kremblas* of my right to refuse to consent to a search of my property, described as: (item, place, things to be searched, location, etc.) *Apartment 150 Van Auker evidence of mailings, contacts, paperwork, records, etc.*

> I have also been advised by ICE Special Agent *Jerrod Kremblas* that, if I voluntarily consent to a search of this property, anything discovered during this search may be used against me in any criminal, civil, or administrative proceedings.

> I have decided to allow ICE Special Agents */ US Postal* and *Rochester Police* to conduct a complete search of my *Apartment*, located at *150 Van Auker St. Apt. 6I*.  These ICE Special Agents are authorized by me to take any letters, papers, materials, or other property which they may desire to examine.

> I hereby voluntarily and intentionally consent to allow ICE to search my property.  My consent is freely given and not the result of any promises, threats, coercion, or other intimidation.  **I have read the above statement and understand my rights.**

(G. Ex. 2).  The form consists of typewritten and handwritten material; the handwritten material that appears on the form is indicated herein in italics.

accent, conversed in English.  (Tr. 32-33).  Nicholson never indicated that he wanted to speak

with an attorney or terminate the interview.  (Tr. 17).

After questioning Nicholson, Kremblas asked him to provide a written statement.

(Tr. 15).  Using a piece of notebook paper from his apartment, Nicholson provided a written

statement.  (Tr. 15-16; G. Ex. 3).  Other than the first sentence of the statement – which

provided, "I, Roydel Nicholson, state the following" – and the last sentence of the statement –

which provided "sworn as scribed to me on 4-24-15 at 9:45 a.m." – Kremblas did not instruct

Nicholson concerning what information should be included in the statement.  (Tr. 16-17, 44-46,

50-51, 56).  Nicholson, Kremblas and Mann each signed the written statement.  (Tr. 17; G. Ex.

3).

Kremblas testified that Nicholson was calm, cooperative, and appeared to

comprehend "what was going on" throughout the interview.  (Tr. 18).  Kremblas testified that no

officer made any threats or promises to Nicholson during their interaction in the apartment.

(Tr. 17-18, 48).  After Nicholson provided the written statement, Kremblas allowed Nicholson to

use the bathroom and change his clothes before handcuffing him and transporting him to the

courthouse.  (Tr. 18-19, 48).


## II.   Nicholson's Affidavit

In support of his suppression motion, Nicholson submitted an affidavit affirming

that he resided at 150 Van Auker Street, Rochester New York on April 24, 2015.  (Docket # 26-1

at ¶ 3).  Nicholson stated that he did not give law enforcement agents permission to enter his

residence or to arrest him.  (*Id.* at ¶ 4).  He further stated that none of the agents explained his

constitutional rights to him "in a way that [he] was able to understand."  (*Id.* at ¶ 5).  According

to Nicholson, he did not believe that he was free to refuse to speak to the agents.  (*Id.*).

Nicholson also stated that none of the agents explained to him "in a way that [he] was able to

understand" that he could refuse permission to search his residence.  (*Id.* at ¶ 6).  According to

Nicholson, he did not knowingly or voluntarily give the agents permission to search the

residence.  (*Id.*).


## REPORT & RECOMMENDATION

### I.     Suppression of Tangible Evidence

I turn first to Nicholson's motion to suppress the evidence seized on April 24,

2015 from his residence located at 150 Van Auker Street, Rochester, New York.  (Docket ## 26,

44).  Because the evidence was seized from Nicholson's residence during a warrantless search,

the legality of the seizure turns on whether a valid exception to the warrant requirement existed.

*Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471

U.S. 386, 390-91 (1985)).  In this case, the government argues that the search was permissible

because Nicholson voluntarily consented to it.  (Docket # 45).  Nicholson maintains that his

consent was tainted by the government's initial unlawful entry into his apartment and their initial

search of the premises.  (Docket # 44 at 10, 12-15).  The government counters that the entry into

the apartment was lawful in order to execute the arrest warrant and that the officers were

permitted to conduct a limited protective sweep to ensure their safety.  (Docket # 45 at 6-9).

### A.     Legality of the Entry and the Security Sweep

Nicholson argues that the protective sweep was unlawful because the agents

should not have entered his apartment, but should have arrested him outside the apartment in the

hall.  (Docket # 44 at 5-9).  Although an arrest warrant generally permits law enforcement

officers "the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within" in order to effectuate the arrest, *Payton v. New York*, 445 U.S. 573, 603 (1980), Nicholson contends that the officers' entry into his apartment was nonetheless unlawful because it was not necessary to effectuate his arrest. (*Id.*). That fact, coupled with Kremblas's admission that he had an investigative interest in searching Nicholson's apartment, demonstrates that Kremblas's decision to enter the apartment and arrest Nicholson in the sitting area was simply a ploy to gain access to the apartment, Nicholson argues. (*Id.* at 14).

According to the government, when Nicholson stepped back from the doorway into his apartment, Kremblas made a "heat of the moment" decision to follow him inside to arrest him. (Docket # 45 at 6-9). The government maintains that Kremblas's decision was reasonable and lawful because (1) the officers had an arrest warrant and (2) six other officers were directly behind Kremblas making it difficult to move easily in the hallway outside the apartment. (*Id.*). The government contends that under these circumstances, the officers were entitled to enter the apartment and, once inside, conduct a protective sweep of the entire apartment as "an area incident to arrest." (*Id.* at 8-9).

During the course of an in-premises arrest, considering the inherent dangers that arise from "taking an individual into custody, officers are automatically justified in searching as 'an incident to the arrest' the area adjoining the place of arrest 'from which an attack could be immediately launched.'" *United States v. Moran Vargas*, 376 F.3d 112, 115 (2d Cir. 2004). (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). Because this protective sweep is justified by the need to protect the arresting officers from the dangers posed by arresting a suspect on his or her "turf," this sweep may be performed "as a precautionary matter and without probable cause or reasonable suspicion," *United States v. Guerrero*, 813 F.3d 462, 467 (2d Cir. 2016)

8

(quoting *Maryland v. Buie*, 494 U.S. at 334), however, it must be limited in scope and "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (quoting *Buie*, 494 U.S. at 327). Officers are permitted to expand this protective sweep to additional areas inside the premises, but only if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Moran Vargas*, 376 F.3d at 115 (quoting *Buie*, 494 U.S. at 334).

"Where agents execute an arrest just outside the home, they are authorized to sweep the house if there are articulable facts that would warrant the reasonable belief that someone within the home is 'aware of the arrest outside the premises' and 'might destroy evidence, escape or jeopardize the safety of the officers or the public.'" *United States v. Guerrero*, 813 F.3d at 467 (quoting *United States v. Oguns*, 921 F.2d 442, 446 (2d Cir. 1990)). Nicholson maintains that because he could and should have been arrested outside his apartment, the government should be required to – and cannot – make this showing to justify the protective sweep. (*Id.* at 7-9).

As in this case, where law enforcement officers are called upon to make quick, on-the-scene judgments under fluid circumstances, courts are appropriately hesitant to "second-guess" those judgments. *See United States v. Hill*, 2005 WL 3320567, *7-8 (D. Conn. 2005) (officer lawfully entered house to conduct arrest despite defendant's presence at the threshold of the doorway; "[g]iven this precarious position, with a number of officers perched upon a small front step, police were understandably cautious[;] [f]or this [c]ourt to conclude that police were obligated to effectuate [the defendant's arrest] on . . . [the] front step . . . would be

the sort of 'unrealistic second-guessing' that the Supreme Court has cautioned against") (quoting *United States v. Casado*, 303 F.3d 440, 447 (2d Cir. 2002)). Here, Kremblas credibly testified that Nicholson himself took a step backwards and that he decided to follow Nicholson because "revers[ing] direction[s]" would have been difficult with so many law enforcement officers behind him in the hall. (Tr. 56). Under such circumstances, I find that Kremblas lawfully entered the apartment in order to arrest Nicholson pursuant to the warrant. *See id.* at *7-10 (entry into home to effect defendant's arrest was lawful despite defendant's presence at the threshold of the doorway).

Because the arrest inside the apartment was lawful, the protective sweep was most likely lawful too, although that determination is complicated by the paucity of information in the record about the layout and size of Nicholson's apartment.[6] *See United States v. Sinclair*, 2012 WL 5389729, *6 (W.D.N.Y. 2012) ("when officers execute an arrest warrant in a small apartment or premises, they generally will be entitled to perform a cursory sweep of the entire premises; by contrast, when they execute an arrest warrant in a larger premises, they will need reasonable suspicion to believe that dangerous persons are present in order to sweep the entirety of the premises or to expand the search to separate floors) (collecting cases), *report and recommendation adopted*, 2013 WL 6154409 (W.D.N.Y. 2013). In any event, I conclude that even if the protective sweep were unlawful, or if, contrary to my holding, Nicholson is correct that Kremblas was required to effectuate the arrest outside of the apartment, Nicholson's subsequent consent to search was nevertheless voluntary and untainted by the entry and sweep.

---

[6] The government contends that the apartment consisted of a living area, where Nicholson was arrested, and two additional rooms connected to the living room area by a short hallway. (Docket # 45 at 8). Although I agree with the government that the record suggests that the apartment contained at least two rooms in addition to the living area (Tr. 40), there is no testimony establishing whether the apartment contained any other rooms, closets, hallways or floors.

B.      **Validity of the Consent to Search**

      The law is well-settled that consent obtained after an unlawful search and seizure may be invalidated as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United States v. Oguns*, 921 F.2d at 447 (applying fruit of poisonous tree doctrine to consent following illegal seizure). In this case, if either the entry or the protective sweep were unlawful, then the validity of Nicholson's subsequent consent would turn on determination of whether the taint had dissipated. *See Oguns*, 921 F.2d at 447. Stated another way, "[t]he government must show that the consent was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id*. (internal quotations omitted).

      Four considerations generally inform the attenuation assessment: "whether a *Miranda* warning was given, the 'temporal proximity' of the illegal entry and the alleged consent, 'the presence of intervening circumstances,' and 'the purpose and flagrancy of the official misconduct.'" *Id*. (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). In addition, the court should also consider whether the officers exploited the tainted evidence in order to induce consent. *United States v. Tortorello*, 533 F.2d 809, 814 (2d Cir.) ("the procurement of a 'voluntary' consent to search based upon a prior illegal search may taint the consent"), *cert. denied*, 429 U.S. 894 (1976); *United States v. Barone*, 721 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) (noting that agents confronted defendant with evidence seized in illegal search in effort to obtain defendant's consent for further search).

      With respect to the first factor, the testimony demonstrates that Kremblas advised Nicholson of his *Miranda* rights by reading the rights verbatim from a rights form. Indeed, Kremblas testified that he questioned Nicholson after reading each right to ensure that he understood his rights. With respect to temporal proximity, the evidence demonstrates that little

time elapsed between the agents' entry and the consent.  According to Kremblas, the

administration of the *Miranda* warnings was completed approximately fifteen minutes after he

knocked on Nicholson's apartment door, and the consent form was read and executed

immediately after that.  Of course, Kremblas utilized a consent to search form that explicitly

advised Nicholson that he had the right to refuse consent and that anything found during the

search could be used against him – "a factor relevant to [the] exercise of [his] free will." *United

States v. Snype*, 441 F.3d 119, 135 (2d Cir.) (citing *Oguns*, 921 F.2d at 447), *cert. denied*, 549

U.S. 923 (2006), *reh'g denied*, 549 U.S. 1090 (2006).

    Finally, the agents' conduct was not "flagrantly illegal or fraught with evil

purpose."  *Oguns*, 921 F.2d at 447.  Kremblas provided a reasonable explanation for his decision

to enter the apartment, and the record is devoid of any evidence to suggest that the security

sweep was a subterfuge for a more expansive search.  Indeed, nothing was apparently seized

during the protective sweep, nor was Nicholson confronted with incriminating evidence prior to

providing his consent to the search.  *See id.* (noting that "[e]ven though the agents were in

[defendant's] apartment when they read him [the] rights, the record is clear that the agents did

not seize any evidence until after [defendant] consented to a search").  Under these

circumstances, I find that any taint from the purportedly illegal entry or sweep was dissipated

before Nicholson consented to the search of his apartment.  *See id.* (agents' illegal presence in

apartment did not taint defendant's consent where *Miranda* warnings were administered, a

consent to search form was utilized, no incriminating evidence was seized during the protective

sweep, and the agents' conduct was not flagrantly illegal); *United States v. Scott*, 517 F. App'x

647, 650 (11th Cir.) (defendant's consent to search was not tainted by prior unlawful protective

sweep that occurred minutes before consent where officer's sweep was appropriately limited to

ensure officer safety, no evidence was seized, and defendant was informed of his right to refuse

consent), *cert. denied*, 134 S. Ct. 273 (2013); *United States v. Punzo*, 208 F. App'x 468, 471-72

(7th Cir. 2006) (defendant's father's consent to search was not tainted by prior protective sweep

of basement where no evidence existed that father was aware of sweep, sweep was limited to

ensure officer safety, and no contraband was discovered), *cert. denied*, 549 U.S. 1343 (2007).

Nicholson also argues that the agents unlawfully remained in the apartment until

Nicholson's consent to search was obtained and that their unlawful presence tainted the

subsequent consent.  (Docket # 44 at 9).  The evidence demonstrates that immediately after

arresting Nicholson, Kremblas placed Nicholson at a table, removed his handcuffs, and

administered *Miranda* warnings.  After completing that process, which took approximately

fifteen minutes, Kremblas requested Nicholson's consent to search utilizing a consent to search

form.  During that time, none of the agents further searched the apartment, and no evidence was

seized.  I conclude, for the reasons stated above, that even if the agents' continued presence in

the apartment while Kremblas administered the *Miranda* warnings and obtained Nicholson's

consent to the search were unlawful, Nicholson's consent was not tainted by such presence.

*Compare Oguns*, 921 F.2d at 448 (officers continued presence or reentry into the apartment after

conclusion of protective sweep was unlawful, but subsequent consent was sufficiently

attenuated) and *United States v. Shyne*, 2007 WL 1075035, *29 (S.D.N.Y. 2007) (agents with

arrest warrant properly remained in defendant's home after sweep to permit him to dress and to

explain the basis for warrant) *with United States v. Isiofia*, 2003 WL 21018853, *6 (S.D.N.Y.

2003) (consent tainted where "the primary illegality was ongoing at the time the defendant

signed [the consent] forms – eight agents were encamped in the defendant's living room for

approximately thirty minutes to one hour and fifteen minutes before he executed the first of these

forms"), *aff'd,* 370 F.3d 226, 234 (2d Cir. 2004) ("the [d]istrict [c]ourt properly weighed the length of time the eight agents remained in the home after the protective sweep among the totality of the circumstances establishing involuntariness").

 I further conclude that Nicholson's consent was voluntary.  It is well-established that a warrantless search is permissible if based upon the valid consent of a person authorized to provide consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996).  The consent need only be voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent.  *See Schneckloth v. Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

 Voluntariness is determined based upon the totality of the circumstances.  *Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990).  Among the relevant considerations are: age, education, background, physical and mental condition, the setting in which the consent is obtained, whether *Miranda* warnings have been administered and whether the individual understands the right to refuse consent.  *See Schneckloth*, 412 U.S. at 226; *United States v. Kon Yu-Leung*, 910 F.2d at 41.  "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority," *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994), and the fact that it is obtained while the individual is in custody does not render it involuntary, *see*, *e.g.*, *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988), although it does "require more careful scrutiny," *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert. denied*, 429 U.S. 820 (1976).

14

The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981). "The ultimate question presented is whether the officer had a reasonable basis for believing that there has been consent to the search." *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).

Considering the totality of the circumstances, I find that Nicholson's consent to the search of his home was voluntary. Although the circumstances of Nicholson's arrest were likely to have been intimidating, the record demonstrates that the agents knocked and announced their presence, explained that they had a warrant for his arrest and, after arresting him, removed the handcuffs and spoke with him while seated at his table. Although there were seven officers in his apartment, none of them drew their weapons or used force to enter his apartment. The credible testimony demonstrates that Nicholson agreed to the search and in fact assisted in identifying locations of potentially incriminating evidence. *See United States v. Crespo*, 834 F.2d 267, 269-71 (2d Cir. 1987) (holding consent voluntary where given after officers displayed guns and arrested and handcuffed defendant), *cert. denied*, 485 U.S. 1007 (1988).

Only after explaining the purpose of their visit and administering *Miranda* warnings did the agents ask Nicholson whether they could search his residence. In making the request, the agents used a consent to search form that informed Nicholson that he had the right to refuse consent and that any evidence found could be used against him. The form that Nicholson signed stated that the consent was freely given and was not the product of threats or force. Kremblas indicated that Nicholson was calm, cooperative, and conversant in English, was not promised anything or threatened by the agents to induce his consent, and did not appear to be

under the influence of drugs or alcohol.  Under these circumstances, I find that Nicholson's

consent was voluntary and recommend that the district court deny Nicholson's motion to

suppress tangible evidence seized from his apartment on April 24, 2015.


**II.      Suppression of Statements**

As with his consent, Nicholson maintains that the statements he made to

Kremblas should be suppressed under the poisonous fruit doctrine.  (Docket ## 26, 44).

Additionally, Nicholson maintains that he did not knowingly waive his *Miranda* rights and that

his statements were not voluntary.  These arguments are analyzed under the same framework as

his arguments regarding his consent to the search.

Assuming that an unlawful security sweep could be sufficient to taint an

otherwise voluntary *Miranda* waiver, *see United States v. Shyne*, 2007 WL 1075035 at *29, the

salient question is whether the statements made by Nicholson were so attenuated from the

unlawful entry that suppression would be improper.  *United States v. Guzman*, 724 F. Supp. 2d

434, 444 (S.D.N.Y. 2010) ("[e]vidence, including statements, obtained subsequent to an

unlawful search may be introduced when the causal link between a Fourth Amendment violation

and a subsequent confession . . . is so long or tortuous that suppression of the evidence is

unlikely to have the effect of deterring future violations of the same type") (internal quotations

omitted).  "[A]ttenuation analysis 'is . . . appropriate where, as a threshold matter, courts

determine that the challenged evidence is in some sense the product of illegal government

activity.'"  *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) (quoting *New York v. Harris*,

495 U.S. 14, 19 (1990)), *cert. denied*, 552 U.S. 836 (2007).  The factors to be considered are

identical to the factors outlined above with respect to consent: "(1) the administration of the

*Miranda* warnings, (2) the temporal proximity between the Fourth Amendment violation and the statements, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *United States v. Guzman*, 724 F. Supp. 2d at 444 (citing *Mosby v. Senkowski*, 470 F.3d at 521). As noted above, the government bears the burden of proving that "the statements were sufficiently attenuated to remove the taint from the unlawful search." *Id.*

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 562 U.S. 1170 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 562 U.S. 1156 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

On the record before me, I find that Nicholson, after being advised of his *Miranda* rights, voluntarily waived them and chose to speak to Kremblas and Mann and that his waiver was not tainted by the agents' entry and security sweep of the apartment. As described above, after the arrest and security sweep, Kremblas and Mann seated Nicholson at the table and asked

him whether he wanted to speak to the agents.  After he responded affirmatively, Kremblas removed Nicholson's handcuffs and read him his *Miranda* rights from a rights form.  Nothing in the record suggests that Kremblas or the other officers acted in a flagrantly illegal manner or attempted to coerce a waiver from Nicholson.  Kremblas paused after each right to ensure that Nicholson understood the right and requested Nicholson to confirm his understanding by placing his initials next to each right on the form.  Kremblas also read aloud a consent to search form, which further informed Nicholson of his rights.  Only after Nicholson signed both forms did Kremblas begin interviewing him.

Kremblas testified that Nicholson was calm and cooperative throughout the interview.  According to Kremblas, Nicholson appeared to understand his rights, was able to converse in English, and was not threatened or promised anything to induce his waiver and subsequent statements.  Under the totality of the circumstances, and considering the attenuation factors identified above, I conclude that Nicholson knowingly and voluntarily waived his *Miranda* rights and that any taint created by the purportedly unlawful entry and sweep was sufficiently attenuated from the waiver.

To the extent that Nicholson argues that his statements were tainted or involuntary because Kremblas asked Nicholson whether he was willing to speak to the officers prior to administering the *Miranda* warnings (Docket # 44 at 13-14), I disagree.  The record establishes that after arresting Nicholson, but prior to administering the *Miranda* warnings, Kremblas twice asked Nicholson whether he wanted to speak with the officers.  (Tr. 7-8).  After Nicholson responded affirmatively, Kremblas thoroughly advised Nicholson of his *Miranda* rights utilizing a rights form.  After having those rights and a waiver provision read aloud to him, initialing each right and executing the document, Nicholson made allegedly incriminating statements.  Nothing

in the record suggests that any incriminating statements were made prior to the *Miranda* warnings.  On these facts, I conclude that Kremblas's pre-warning requests did not taint Nicholson's subsequent waiver or otherwise render his statements involuntary.  *See United States v. Williams*, 2015 WL 4477785, *16 (N.D. Ga. 2015) (rejecting defendant's argument that his statements were coerced where officer obtained defendant's agreement to talk prior to administering warnings; "I find that [the officer] asking [the defendant] if he agreed to talk before administering *Miranda* warnings was not coercive to an extent that the properly-given warnings did not give [defendant] the 'real choice between talking and remaining silent'") (quoting *Missouri v. Seibert*, 542 U.S. 600, 609 (2004)).

For the reasons discussed herein, I recommend that the district court deny Nicholson's motion to suppress the statements he made on April 24, 2015.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny defendants' motion for suppression of tangible evidence and statements.  (Docket # 26).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       June 15, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　*s/Marian W. Payson*
　　　　　　　　　　　　　　　　　　　　　　　MARIAN W. PAYSON
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Dated: Rochester, New York
　　　　　June 15, 2016

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).